DAWKINS, J.
Plaintiff and defendant, on June 20, 1917, entered into two separate contracts for the drilling of wells in an effort to find oil and gas in what is termed “wild cat” territory. The contracts are identical, with the exception that one of the wells was to be drilled on the Pearson tract of land in Union parish, La., and the other on the Streetmeir tract, near the town of Snyder in the state of Arkansas. For the purposes of this case, we quote the one covering-operations in Louisiana:
State of Louisiana, Parish of Ouachita:
This contract and agreement made and entered into this 20th day of June, 1917, by and between Wm. M. Brown, a resident of Miami, Florida, herein designated as party of the first part, and R. E. Allison, a resident of Shreveport, Caddo parish, Louisiana, herein designated as party of the second part, witnesseth:
That whereas the said Allison hereby agrees and obligates himself to furnish all material including derrick, pipe casing, drill stems, fuel and water, and all supplies to drill a well in search of oil or gas for the said party of the first part at or near Farmersville, Union parish, Louisiana, on the M. J. Pearson and Mrs. Sadie Pearson tract of 1190 acres, situated in section 31, Tp. 21 N. R. 1 W., on the location to be made by the party of the first part to a depth of twenty-seven hundred fifty feet, unless oil or gas in paying quantities is found at a shallower depth.
In drilling this well, and furnishing material, the said Allison obligates and binds himself to set approximately three hundred fifty feet of ten-inch casing, should it be found necessary to do so, and to set approximately twenty-two hundred fifty feet of six-inch casing and cement the same and allow it to stand six or eight days to give sufficient time for the cement to set and harden herein. The party of the second part shall then drill out the cement plug and drill six or eight feet below the casing and bail the well, then allow the well to stand four hours and bail again, and if the casing is thoroughly dry and tight then the party of the second part is to drill in and drill to a depth satisfactory to both parties or to the contract depth of twenty-seven hundred fifty feet.
After four and one-half inch liner has been set and thoroughly washed out with clear water and the well bailed, then this contract will be completed. Should it be found that the four and one-half inch liner cannot be pulled, then the party of the second part is to drill deeper through the liner.
. Should it be decided to drill deeper than the contract depth of twenty-seven hundred fifty feet, then the party of the first part binds himself to pay actual cost for the additional depth below the twenty-seven hundred fifty feet. The party of the first part agrees and binds himself to hold the contractor harmless from any loss whatsoever sustained in drilling this well below twenty-seven hundred fifty feet.
The consideration for the drilling of this well is the sum of seventeen thousand dollars, being sixteen thousand dollars in cash and one thousand dollars in stock of the Louisiana Arkansas Oil & Development Company full paid and non-assessable. Stock certificates to be delivered as soon as organization of said company has been completed and stock certificates ready for delivery.
Payments for the drilling of this well to be as follows:
On signing of contract and approval by L. B. Clifford, $1,000.00.
When rig, machinery and pipe are on the ground and drilling commences but not before July 15th, 1917, $3,000.00.
When down one thousand feet, $3,000.00.
When down two thousand feet, $3,000.00.
On completion well, $6,000.00.
The contract is subject to the following provisions :
(1) Its approval by L. B. Clifford of Texarkana, Ark.
(2) Where oil and gas in paying quantities is mentioned it is understood to mean, gas in paying quantities five million cubic feet, oil in paying quantities ten barrels per day.
(3) Whereas the party of the first part has already erected or intends to erect, a derrick on the above location to be used in the drilling of this well, the party of the second part agrees *533 to allow a credit for the actual cost of the same on the third payment herein mentioned.
(4) It is agreed that the party' of the second part shall give the party of the first part ten days’ notice of the third and fourth payment of three thousand dollars each by registered mail or telegram to his address at Miami, Fla., and such notice shall be held sufficient, and if the said deferred payments are not paid within the said ten days, such default shall render all remaining payments due in full.
(5) This contract shall become immediately effective on the approval of L. B. Clifford, and for payment shall be made by him in the absence of the party of the first part.
In case any modifications of this contract said L. B. Clifford is hereby given power of attorney to sign new contracts in behalf of party of the first part.
The party of the second part agrees to start operations on the aforesaid well by July 1st, 1917.
Both contracts were subject to the approval of one L. B. Clifford, and were each duly approved by him.
Brown made the initial payments of IN-COO each at the signing of the contracts, as well as the two second payments of $3,-000 each when the drilling commenced, or a total of $8,000. The well in Arkansas reached a depth of 1,000 feet on August £9, 1917, and the one in Louisiana on September 4th, of the same year, and which, according to the contract, matured the third payments of $3,-000, subject to the 10 days’ notice required to be given by registered mail by section 4 of the contracts, ■ and the failure to pay within said 10 days, said third installments, it was provided should mature the balance to be-paid under said agreements.
Allison did not give the notice by registered mail, but on September 6th saw and notified both Brown and Clifford personally. Demand for payment was also made verbally on September 8th, and Brown requested that Allison wait until September 15th, which appears to have been acquiesced in. The parties did not again meet until September 22d, when demand was again made, and at this juncture a controversy arose as to the quantity and size of pipe which plaintiff had used and was using; defendant claiming that more 8 and 10 inch casing should be used, and plaintiff contending that he had! used and was using all of each that was necessary. Considerable discussion followed, and defendant says that it was finally agreed that the matter of the pipe would be deferred until the final- payments were due; that plaintiff was to meet him at a hotel in the city of Shreveport, on September 24th, and that he made out checks for the third payments with receipt for plaintiff to sign reserving the issue as to the pipe, but that plaintiff failed to keep his appointment, and he (defendant) left for Houston, Tex., and from there went to Tulsa, Okl. Plaintiff denies that any understanding was ever reached as to the casing.
On September 29th, Brown wrote Allison two letters from Tulsa, inclosing checks signed by Brown and Bush, on the Bank of Bay Biscayne of Miami, Fla., for $2,362.96 and $2,566.72, to cover the third installments on-the Louisiana and Arkansas wells, respectively, less certain deductions, which were-apparently satisfactory. These letters were' received about October 5th, and plaintiff immediately deposited the checks in the City National Bank of Shreveport for collection, and at his request the latter Bank of Shreveport wired the bank at Miami as follows-.
“Shreveport, La., Oct. 5th, 1917.
“Will you pay checks drawn on you by Wnr. Brown $4,929.68? Telegraph us quickly at our expense, City National Bank.”
To which it replied:
“City National Bank, Shreveport, La.
“Cannot interpret sixth word reading complete your telegram yesterday.
“Bank of Bay Biscayne.”
The record does not disclose what reply was made, but on October 8th, the Miami. Bank wired as follows:
*535 “Oct. 8, 17.
“City National Bank, Shreveport, La.
“Telegram received. Cannot guarantee cheek by wire.
“Bank of Bay Biscayne. 5:21 p. m.”
On October 9th, plaintiff brought this suit against defendant as a nonresident, accompanied by writ of attachment, making the Commercial National Bank of Shreveport garnishee, and seized in its hands certain collaterals. I-Ie claimed the entire balance of the payments under each contract as having matured by the failure to pay the third. He further alleged that the defendant had failed to deliver the stock for $1,000, stipulated in each of the two contracts, and that he was entitled to recover in lieu thereof the sum of $2,000. He prayed that the attachment be sustained and for judgment in the sum of $26,000.
Defendant appeared and moved to dissolve the attachment on the grounds: first, that the writ had been issued without a “ fficient” order of court; and, second, that the allegations of the petition were untrue, which motion was referred' to the merits.
Thereupon, defendant answered denying that plaintiff had drilled the wells in accordance with the contracts. He averred that plaintiff had agreed to use approximately 350 feet of 10-inch and approximately 1,200 feet of 8-inch casing, and had. used practically none of either. He further averred that checks had been timely delivered for the third payments, which plaintiff had accepted and without presenting the same for payment had brought this suit and stopped work on the wells.
Defendant admitted that the Louisiana Arkansas Oil & Development Company had not been organized nor the $2,000 worth of stock thereof delivered to plaintiff, but averred that no demand therefor had been made by plaintiff.
He further averred that the checks which were given upon the Bank of Bay Biscayne were good and valid and would have been paid, had plaintiff presented them in the regular order, but, after this suit was filed, he (defendant) stopped payment thereon.
Defendant prayed that plaintiff’s rights under the contract be decreed to have been forfeited, that his demands be rejected, and for judgment in reconvention in the sum of $2,750 as damages.
There was judgment in favor of plaintiff for $22,689.68, with legal interest from date of judgment; and further allowing defendant 60 days in which to organize the Louisiana Arkansas Oil & Development Company; and to deliver to plaintiff $2,000 worth of the stock thereof, in default of which plaintiff should recover the further sum of $2,000; and sustaining «the attachment on the property seized in the hands of the garnishee, subject to the latter’s rights.
Defendant has prosecuted a devolutive appeal.
Opinion.
Defendant’s brief makes the following assignment of errors, to wit:
“(1) The court erred in sustaining the writ of attachment sued out.
“(2) The court erred in giving judgment for the plaintiff in any sum against the defendant.
“(3) The court erred in not holding that the plaintiff was without right to bring the present suit without presenting the checks which he had accepted for payment, or at least giving the defendant some notice of his intention to do so.'
“(4) The court erred in not giving to the defendant damages against the plaintiff for attorney’s fees and for the loss he sustained on account of the abandonment of the work.
“(5) The court erred in not holding that by abandoning the work the plaintiff had forfeited his right to any compensation for drilling the well.”
Specifications Nos. 1 and 3 may be treated together, as we take it that the contention made in No. 1 that the writ of attachment should not have been sustained is upon the theory that, .having accepted the checks, the suit was premature when brought before actually presenting them for payment
*537 It can hardly be gainsaid that, if the position taken by defendant in the controversy with respect to the pipe which arose shortly before the suit was filed was not supported by the facts and provisions of the contracts, the third installments of $3,000 each were considerably overdue, although the notice of 10 days by registered mail had not been given. However, neither in the conversation between the' parties, nor in the pleadings and brief, is any complaint made on this score, and we take it that, whatever might have been the purpose in providing for this notice, it had and has no importance in determining the rights of the parties, having apparently been waived; the only excuse given for failure to pay according to contract being as to the casing.
[1] Reading the contracts, it is found that the quantities of 8 and 10 inch casing mentioned were to be used “if necessary.” The only direct testimony on the point is to the effect that it was not necessary to use any more of this casing than was used by plaintiff ; although an expert without any knowledge of the conditions at the wells testified that in his opinion the nature of the earth’s strata in the two localities required .the use of such pipe as was stipulated. It is conceded that the reason for using such pipe is to protect the sides of the hole to prevent caving or falling into the hole of foreign matter in the course of the drilling, and the undisputed testimony is that such necessity had not arisen. In the controversy between the parties prior to the suit, defendant’s complaint against the failure to use more pipe appears to have been grounded upon the proposition that, if the wells proved failures, they would have a greater salvage value if the quantity of pipe mentioned were used. But no such purpose or requirement was put in the contracts, and the stipulation was that the pipe was to be used only if necessary. The necessity not having been shown,' but, on the contrary, having been proved not to have arisen, we think the contention of defendant in that regard failed.
[2] Hence, when the suit was filed, not only the third but the remaining installments. according to the specific provisions of the contract, had matured, unless the receipt and depositing by plaintiff of the checks for the third payment^ can' be said to have waived those features. When' the checks were received, the installments were long overdue, and what plaintiff did was to deposit them and have his bank endeavor to ascertain whether or not they were good. It is evident that he only intended.to.accept them if it were found that they would be paid; for, as stated, he had the Shreveport Bank wire immediately on the day they were deposited (October ,5th) to ascertain their value. . The bank at Miami did not reply until the day following, and then indicated that there was something obscure in the message (though nothing is said about this in the testimony' of the cashier taken by commission). Evidently this obscurity was cleared up, but the said bank did not wire its refusal to guarantee the checks until October 8th, three days after it had received the first message, and which plainly stated an immediate answer was desired.
It is true that, instead of describing the checks as those of Brown & Bush, in whose name they were signed, the Shreveport Bank referred to them as checks of Wm. Brown. But the evidence introduced by defendant to show that he had made arrangements with the Miami Bank for funds to meet them shows that the agreement was with Brown, and, if this was the reason (which is not one given by the officers of that bank for refusing to wire their guarantee) for not being willing to guarantee their payment, it could easily have cleared the matter up by advising the Shreveport Bank to that effect. On the other hand, a naked refusal was sent.
In these circumstances, we do not see how *539 it can be said that plaintiff, by endeavoring to ascertain if the checks were good, and, if so, to accept them and thereby waive the default of defendant on the contracts, is in a worse position than he would have been had he declined them altogether. As a matter of fact, even at the time of giving their testimony by the officers of the bank the proceeds of the 'note which defendant had arranged to discount had not been passed to his credit, or to that of Bush '■á Brown, although those officers say they would have paid the checks had they come through in ordinary channels.
In our opinion there was no acceptance of the checks in the sense that one who takes a ■ check which he knows to be good in payment of a past-due debt, may be said to have accepted it; but the conclusion, from the proven facts, is irresistible that plaintiff only intended to receive them and to waive the effect of defendant’s delinquency under the contracts, if investigation satisfied him that the checks would be paid. We further think that the result of that investigation, from his standpoint, was such as to justify any reasonable man in believing that they had no value, and that he was further justified in disregarding them and bringing the suit as he did. Phifer v. Maxwell, 28 La. Ann. 802; Saloy v. Dragon, 37 La. Ann. 73; C. C. 2185, 2187, and 2190.
[3] Defendant was a nonresident and plaintiff had the legal right, if his claims were due, to resort to attachment. Code of Practice, art. 243.
Specifications of error Nos. 2, 4, and 5 may be treated together, since they are based upon the alleged abandonment of work on the wells.
The record shows that at the date of the trial, November 13, 1917, plaintiff had drilled both wells to a depth of more than 2,000 feet, and which, in the absence of the default clause, had matured the fourth installment, provided proper notice thereof were given. It also appears that at the time of the trial, although drilling had stopped, plaintiff had his rigs on the premises, in charge of caretakers, "ahd was prepared to go on with the work when paid for that which he had already performed according to the contract. We cannot assume, therefore, that he will refuse to complete the wells when and if the price thereof is paid. In any event, the entire consideration, by the very terms of the contracts themselves, is due, and if, after being paid, should plaintiff decline to proceed, defendant would not be precluded from pursuing the remedies which the law affords. As the bond is written, we must enforce it.
[4] As to the claim of defendant for damages, being first in default on his obligations under the contract, he has no standing to claim damages for the default of his adversary. Pratt v. Craft, 20 La. Ann. 291; Pratt v. Craft, 19 La. Ann. 130; Vance v. Tourne, 13 La. 229; Enders v. Gingras, Mulhaupt & Co., 38 La. Ann. 773; Sitman & Burton v. Lindsey, 123 La. 53, 48 South. 646; Murphy Case, 130 La. 914, 58 South. 766; Godchaux v. Chi. Lbr. & Coal Co., 131 La. 112, 59 South. 33.
For the reasons assigned, the judgment appealed from is affirmed, with costs.